UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED by CBR D.C.

JUN 1 2 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

Randolph H. Guthrie III

v.

US Government,
City of New York,
City of Miami, FL,
Dade County, FL,
Walgreens,
CVS,
Baker Donelson,
Robert Hauberg,
Lee Lott,
J & J Teq III, Corp.,
Iconbrickell Master Association, Inc.,
Iconbrickell Condominium No. One Association, Inc.,
Riverside Park Community, LLC,
Riverside Park Community II, LLC,
Urban American Management,
Kings Realty & Properties LLC,
IAC/InteractiveCorp,
eHarmony.com,
Facebook Inc.,
Federal Express Corp.,
United Parcel Service, Inc.,
Directv,
Apple Inc.,
AT&T Inc.,
Columbia University Medical,
New York Presbyterian Hospital,
Jonathan Jacobs,
Joseph Del Pizzo,
Tara Tamang,
Carol Malek,
Malek Properties

COMPLAINT

Case #

Jury Trial Demanded

**Parties:**

Plaintiff, Randolph Guthrie, is a US citizen and a resident of Miami, FL. Defendants are the US Government and its co-conspirators who are individuals, corporations, and local governments.

1

**Jurisdiction:**

This Court's jurisdiction is invoked pursuant to 28 USC 1331, 2201, & 2202. The asserted rights and interests of the plaintiffs exceed $100,000,000 exclusive of interests and costs. The substantive claims in this action arise under 28 USC 2671, 42 USC 1983, 96 USC 1961, as well as Common Law.

Many of the various acts, actions, and conspiracies alleged in this complaint were engaged in and carried out by, between, and among individual defendants under color of law.

**Venue:**

The Southern District of Florida is the proper venue for this action. According to 28 USC 1402(a) a civil action in a district court against the United States may be prosecuted only in the judicial district where the plaintiff resides.

**Introduction:**

I filed two prior related lawsuits in the Southern District of New York (case numbers 09 CV 0990 & 11 CV 0211) where I was living at the time. I am now living in Miami which is why I am filing in a new district.

The 09 case was dismissed based on failure to give proper notice as mandated by the Federal Tort Claim Act. At the time I believed that I was not able to refile due to statue of limitations issues. Since then I have realized that due to the fact that there is an ongoing conspiracy that the statue of limitations has not even begun to toll which is why I am now incorporating those claims into this present suit.

The 11 case was dismissed before any of the defendants had even answered the complaint. I appealed but while I was in China a document which I had properly filed with the clerk mysteriously vanished from the file with the result that the appeal was dismissed. In representing those same claims to this court in this case my purpose is not to try to 'shop around' for a more sympathetic court, but since the time limit for refiling the appeal has run out refiling all the claims is the only way that I know of to properly exercise my Constitutional right of access to the courts.

**Claims:**

1) I was arrested and prosecuted in Federal court for copyright infringement in September 2005.

2) I was represented in that criminal case by the law firm Baker Donelson and by the lawyers Robert Hauberg and Lee Lott who are partners at that firm.

3) I have recently come to realize that these lawyers, while they were representing me, were colluding with the US Government and prosecution, thus violating attorney client privilege and denying me my right to competent legal representation.

4) These lawyers thus defrauded me in the amount of their billings which were in the range of $500,000.

5) As a result of these lawyers pressuring me to plead guilty I served 26 months in Federal prison, paid $820,000 in fines and forfeiture, and am now a felon. It is, of course, impossible to know what result might have occurred had I had honest and ethical legal representation.

6) It might be argued that the US had an excellent case against me and they did except for one problem. The US and Chinese Governments were by their own declarations partners in the investigation and prosecution of me and my DVD business. Thus the US was not entitled to prosecute me a second time for crimes for which I had already been prosecuted and sent to prison in China. The Chinese fined me $180,000. What do you get when you add $180,000 to the $820,000 that the US took from me? On instructions from the US my lawyers purposely ignored this issue and failed to file discovery motions which would have forced the US to acknowledge the above facts.

7) Another example of my lawyers' willful failure to properly represent me is their failure to inform me of the approximately fifteen month sentence reduction that is typically granted to participants in the drug and alcohol treatment program run in federal prisons. As a result I minimized the extent of my alcohol problem when interviewed during the presentence investigation. Later I found out about the drug and alcohol program on my own and saw a therapist so that I could be eligible for the program. These lawyers were again acting on instructions from the US.

8) I was incarcerated at FCI Ft. Dix from April 2006 to June 2008.

9) During my incarceration at FCI Ft. Dix the FCI contained at least several hundred federal undercover agents posing as inmates.

10) Many agents who were newly hired were there being trained through the process of being exposed to criminals in a controlled environment.

11) Many of the newly hired agents are recruited from the military. FCI Ft. Dix is not an uncomfortable environment for them since the prison housing units at Ft. Dix are in fact decommissioned military housing.

12) A small number of the federal agents at Ft. Dix are older experienced agents who are there to supervise the trainees.

13) Some of the trainee agents move on to the medium and maximum security prisons after their training at Ft. Dix. To facilitate their acceptance by the inmates at maximum security prisons, many of whom have been there for decades, it is necessary for these agents to spend months in the Special Housing Units (SHU) at these prisons. In order to train and condition these agents to the harsh conditions they first spend months in the SHU at Ft. Dix.

14) Many low security prisons do not have SHU's as the sorts of inmates at lows do not generally incur disciplinary incidents that would require placing them in a SHU.

15) Many of the inmates at lows would be in camps but for disqualifying factors such as non-US citizen status, detainers, etc.

16) In the event that an inmate at a federal correctional institution which does not have a SHU merits being placed in a SHU he is generally transported to a nearby federal (or even state/local facility) which does have a SHU.

17) FCI Ft. Dix did not have a SHU until a few years ago. Now it is virtually full. Prior to the SHU being constructed at Ft. Dix the occasional inmate who was caught fighting was sent to the SHU at FCI Fairton, a forty-five minute drive.

18) The construction of the SHU at FCI Ft. Dix may have coincided with the prison's use as a training facility for federal undercover agents.

19) The SHU at FCI Ft. Dix has security features such as frosted windows not found even in SHU's in maximum security prisons.

20) The SHU at USP Lewisburg not only has transparent windows, but the windows can also be opened. There is even a sign posted on the outside wall of the Lewisburg SHU instructing inmates on the running track not to yell to inmates in the SHU, obviously a violation of inmates' right to free speech.

21) The SHU at FCI Ft. Dix also has another odd feature. The ceiling is not painted. The walls have been painted, but the ceiling has been purposely been left as bare concrete. The SHU at FDC Philadelphia has a painted ceiling as well as transparent windows.

22) The Ft. Dix SHU's ceiling may have been left bare so as to provide camouflage for fiber optic video surveillance devices that would be harder to camouflage were the ceiling painted solid white to match the walls.

4

23) The overwhelming majority of inmates in the SHU at FCI Ft. Dix are in fact federal agents.

24) The fact that the SHU is populated by federal agents instead of bona fide inmates with disciplinary problems may explain why SHU inmates are allowed contact visits in the same manner and, in fact, in the same visiting room as non-SHU inmates. This whole procedure is truly laughable. While in the SHU inmates are considered such a security threat that they have to be handcuffed through the food slot before the cell doors can be opened. They are not allowed outside their cells without being handcuffed. However once they reach the visiting room, as if by magic, the handcuffs come off and the SHU inmates are allowed to walk around unhandcuffed not only in the presence of guards and other inmates, but with the visitors as well!

25) Occasionally real inmates are placed in the Ft. Dix SHU for reasons related to the agent training program and not primarily for reasons of institutional security, as required by law.

26) Examples of inmates placed in the Ft. Dix SHU for reasons related to the agent training program would be myself and Robert Brennan, the penny stock fraudster who was twice profiled on 60 minutes.

27) Below is a list of federal undercover agents who have masqueraded as inmates.*
James Labate –   49446-054  (www.americanmafia.com/Feature_Articles_54.html)
Irwin Schiff –      08537-014  (www.paynoincometax.com)
Timothy Ernle – 01182-055  (US v. Knoll (16 F3d 1313) )†
Jason Vale –      09073-067  (www.apricotsfromgod.info)
Kurt Walter –    25008-038
David Leichus – 35506-054  (David did not do his prison time at Ft. Dix with the plaintiff.)
Thomas Williams  ('escaped' from Ft. Dix in June 2006, last seen riding away on a lawnmower)
Daniel Gordon – 55795-054  (www.sec.gov/litigation/litreleases/lr18515.htm)

* I have provided the inmate numbers that I believe to be correct from www.bop.gov. I cannot guarantee their accuracy. The web links are listed so as to provide some background information on the individuals concerned.

† Timothy Ernle played a critical role in US v. Knoll (16 F3d 1313). Apparently in June 1986 Tim burglarized a law office and then 'unsolicited' brought the purloined documents to an AUSA. Tim's status as a Fed would seem to throw that case in an entirely new light. If the reader is still skeptical he should compare Timothy Ernle's picture with that of Maj. Gen. Bill Donovan the OSS chief and a former head of the DOJ criminal division. Except for the noses, the faces are nearly identical. Tim told me that Bill Donovan was his great uncle, which I took with a grain of salt until I saw Bill Donovan's picture in a book. Bill Donovan and Tim Ernle are also both from the Buffalo, NY area.

28) The US trumped up disciplinary incidents to suit the needs of the agent training program rather than for legitimate correctional interests.

29) The US violated my right to substantive due process throughout my incarceration at FCI Ft. Dix.[1]

30) The substantive due process violations occurred as the result of the US running the prison primarily for the benefit of the federal agent training program rather than for the US' legitimate correctional interests.[2]

31) The US violated my right to equal protection.[3]

32) The US' disciplinary and other discretionary decisions with respect to myself were tainted by the existence of the agent training program and its inherent conflict with normal prison functions.

33) The deliberate misuse of the prison disciplinary process constitutes the common law tort of abuse of process. [4]

34) Some of these disciplinary incidents resulted in my loss of "Good Time", a statutory liberty interest.

35) Some of these disciplinary incidents resulted in my being unable to participate in the Residential Drug Abuse Program (RDAP) and the loss of an approximate one year reduction in prison time.

36) The time off for successful completion of the RDAP constitutes a state created liberty interest.[5]

37) I spent many months in the SHU for reasons not related to institutional security.[6]

---

[1] Daniels v. Williams (106 S.Ct. 664) – Justice Renquist examined the history of the due process clause and found that it was originally intended to protect individuals from oppression and "the arbitrary exercise of the powers of government".

[2] Rochin v. California (342 US 165) – Substantive due process prohibits tortuous state conduct that "shocks the conscience" and "offends the cannons of decency and fairness".

Hall V. Tawney (621 F2d 607) – Substantive due process prohibits "those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible."

[3] Willowbrook v. Olech (528 US 562) – The Court explained that the purpose of the equal protection clause "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." [Plaintiff] need only show intentional and arbitrary discrimination to his detriment.

[4] No exception under 28 USC 2680 - See note 15

[5] Meachum v. Fano (427 US 224) – The state may create "liberty" within the meaning of the due process clause. Consequently, in prison due process cases, the Court looks to state statutes and regulations to determine if a liberty interest, and therefore a right to procedural fairness, exists. The state is deemed to create a liberty interest if the pertinent statues and regulations impose substantive limits on the discretion to make such decisions. Thus if a statue governing parole specifies criteria for decision, a liberty interest exists and process is due.

38) Transfer from the Ft. Dix Camp to the SHU deprived me of a liberty interest.[7]

39) Conditions in the Ft. Dix SHU are actually worse than the conditions in the Federal Supermax prison in Florence, Colorado.[8]

40) Some of my time in the SHU was the result of biased disciplinary incidents.

41) The conflict of interest related to the agent training program violated my right to procedural due process when being deprived of a liberty interest.

42) Some of my time in the SHU resulted from my requesting protective custody in order to get away from federal undercover agents.

43) One protective custody request resulted when I was the only white man assigned to a room the other occupants of which were all black.

44) I was denied a room change even though the housing unit was half empty.

45) I had roomed with blacks before without difficulty, both in mixed race rooms and with a single black roommate while in a two man SHU cell.

46) I felt that these particular blacks behaved like 'gangstas' and were going to be trouble.

47) Room changes are extremely simple. They can be accomplished by a staff member with a few keystrokes in as little as one minute.

---

[6] River v. Fogg (371 F.Supp. 938), Kelley v. Brewer (239 NW2d 109), Daughtery v. Carlson (372 F.Supp. 1320), Clifton v. Robinson (500 F.Supp. 30) – The courts view the proper purpose of isolated confinement to be the maintenance of order within the institution.

Hancock v. Avery (301 F.Supp. 786), Jordan V. Fitzharris (257 F.Supp. 674), Attorney General v. Worcester (413 NE2d 772), West v. Lamb (497 F.Supp. 989), Milhouse v. Carlson (652 F2d 371) – therefore any punishment that is not necessary to maintain order is cruel and unusual and prohibited by the Eighth Amendment.

Bono v. Saxbe (450 F.Supp. 934, 620 F2d 609) – Punishment in disciplinary segregation for no offense would be, a fortiori, disproportionate and cruel and unusual.

Johnson v. Anderson (370 F.Supp. 1373), Breece v. Swenson (332 F.Supp. 837) – Arbitrary or discriminatory imposition of solitary would also come within Eighth Amendment prohibition.

[7] Wagner v. Hanks (128 F3d 1173) – In deciding whether a liberty deprivation occurred, a federal court after Sandin [Sandin v. Connor (115 S.Ct. 2300)] must compare conditions in disciplinary segregation with conditions in which the general population of the prison is confined. If the prison were a "country club" in which the prisoners enjoyed a great deal of freedom, spending little time in their cells or even in the prison buildings, confinement for a protracted period in what amounts to solitary confinement would work an atypical and significant deprivation of their liberty.

[8] Wilkinson v. Austin (125 S.Ct. 2384) – Prisoners have a liberty interest in the determination of whether they are transferred to a supermax prison.

48) Room changes are routinely granted so long as they do not become frequent requests.

49) I had never previously requested a room change.

50) When Ft. Dix staff chose to place me in protective custody rather than grant me a room change I realized that my housing assignment had been a 'set-up' from the beginning.

51) Insisting that I live in a room with extremely unpleasant roommates was part of the US' ongoing effort of intentionally inflicting emotional distress upon me.

52) During the course of the room change incident I approached the staff member in charge of room assignments, a Mr. Dixon, and told him that "If I dont get a room change I am going to have to 'check in' [to the SHU]". As a result of this statement and my ensuing 'check in' I received a disciplinary incident report from Mr. Dixon for "Refusing to Program".

53) Some of my time in the SHU resulted from my requesting protective custody so as not to be subject to arbitrary and capricious work assignments.[9]

54) While assigned to work in the landscaping team in facilities maintenance I was given a disciplinary incident by staff member Dixon for reading quietly in the prison library even though Mr. Dixon did not even work in facilities.

55) Mr. Dixon then told me that I would be working for him in the future.

56) Mr. Dixon supervised the orderlies in the housing unit that I had occupied.

57) Being an orderly is one of the easiest jobs at Ft. Dix.

58) An orderly can generally finish his job for the day in less than half an hour.

59) Once an orderly has finished his job he is free to watch TV, read, etc. for the rest of his shift.

60) My unit had approximately one hundred orderlies assigned to it.

61) In a non-prison environment a building such as that, with about ten thousand square feet of common area and twelve bathrooms, would likely have at most five orderlies working in it.

62) I was told by Mr. Dixon that I must work outside the building picking up trash, etc.

---

[9] Battle v. Anderson (376 F.Supp. 402, 993 F2d 1551) – no assignment to jobs on an arbitrary or capricious basis.

63) I was further told that I alone was not allowed inside the housing unit during my shift, except to use the bathroom.

64) When Mr. Dixon found me reading a magazine under a tree and confiscated the magazine it became obvious to me that I was being singled out for cruel and unusual punishment.

65) My arbitrary and capricious work assignment amounted to cruel and unusual punishment[10] and was part of the US' ongoing effort of intentionally inflicting emotional distress upon me.

66) I was forced to work in conditions that violated my constitutional rights.

67) I was forced to work when the heat index exceeded 90.

68) I was forced to wear heavy polyester clothing when the heat index exceeded 90.

69) I was not provided with an electric fan when the heat index exceeded 90. [11]

70) I was forced to work when sick.

71) I was refused the medicine Finisteride even though it was available in the prison pharmacy and I had been taking the medicine before arriving at Ft. Dix.

72) I had a valid doctor's prescription for Finisteride when I arrived at Ft. Dix.

73) As a result of being refused Finisteride I suffered permanent hair loss.

74) In refusing to allow me to receive Finisteride, whether from the prison pharmacy or from an outside pharmacy, the US is guilty of the common law tort of intentionally preventing assistance. [12]

75) I was denied Administrative Remedy Forms by my unit staff (and all other BOP staff) while in the SHU.[13]

---

[10] Ray v. Mabry (556 F2d 881) – Work assignments that amount to cruel and unusual punishment are forbidden.

[11] Gates v. Cook (376 F3d 323) - If the heat index reaches 90 degrees or above, the defendant will insure that each cell is equipped with a fan. (This case concerns death row inmates who presumably lie on their bunks in their underwear when they are hot.)

[12] Torts, Second §326

[13] Abney v. McGinnis [380 F3d 667] - Defendants may also be estopped  from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.

76) The denial of Administrative Remedy Forms is a violation of an inmate's First Amendment right of access to the courts.

77) Certain Ft. Dix staff members, such as the chaplains, did not visit my area of the SHU in spite of having signed the SHU log book.

78) Certain BOP staff, including chaplains, are required to make regular visits to inmates in the SHU.[14]

79) Preventing chaplain visits is yet another example of the US' ongoing effort to intentionally inflict emotional distress upon the plaintiff.

80) While I was in the SHU in the wintertime the heating broke or was turned off.

81) The heat was in fact intentionally turned off so as to increase my level of emotional distress.

82) I was subject to cold temperatures without adequate clothing or cold weather bedding.[15]

83) While I was in the SHU during warm weather there was a continuous insect infestation problem.[16]

84) When informed of the insect problem by many inmates on many occasions the wardens, SHU supervisors, and other staff ignored the problem.

85) While I was in the SHU no insecticide was sprayed in the cells.

86) While in the SHU I was denied timely access to my mail.

87) When I complained about the denial of timely access to my mail to Ms. Brocia (spelling approximate), the Ft. Dix staff member in charge of the mail room, she sincerely promised to look into the matter.

88) Generally Ms. Brocia visited the SHU together with the warden and his other senior staff.

89) After the mail complaint Ms. Brocia avoided the plaintiff's hallway in the SHU.

90) BOP staff members who are making general SHU visits are obligated to walk by every cell.

---

[14] St. Claire v. Cayler (634 F2d 109) – Prohibiting prisoners in isolation or segregation from attending chapel is unconstitutional.

[15] Chandler v. Baird (926 F2d 1057) – A claim of exposure to cold temperatures in disciplinary segregation stated a claim for relief.

[16] Antonelli v. Sheahan (81 F3d 1422) – Inmate stated Eighth Amendment claim where he alleged that there was a pest control problem.

10

91) Mail that I had already received was taken from me.

92) The sequestered mail included my books and legal papers.

93) I complained about the mail sequestration to the warden, assistant wardens, and all other staff every time that I saw them in the SHU.

94) The illegal seizure and withholding of my mail is yet another example of the US's ongoing campaign of intentionally inflicting emotional distress upon me.

95) I was threatened with forced blood extraction when I refused to give blood for the purposes of DNA testing.

96) The DNA testing was a result of routine BOP policy rather than being court ordered.

97) Mandated blood removal in the absence of a court order is a violation of an inmate's constitutional rights.

98) I eventually chose to trade my blood for the return of my books.

99) One of my cellmates, surname Day, who is an undercover Federal agent, threatened to stab a pencil in my eye.

100) On many occasions federal agents posing as inmates made reference to inmates being stabbed as well as to shanks being buried in the prison compound. There were in fact no incidents of this nature that occurred during my incarceration at Ft. Dix. These stories are yet another example of the US' ongoing effort of intentionally inflicting emotional distress upon me.

101) During my last month at Ft. Dix I was seen by a BOP psychiatrist who prescribed me antidepressants to treat my mental distress.

102) My Federal probation officer found me to be sufficiently mentally disturbed upon my release from prison that he ordered me to get psychiatric counseling.

103) As a result of the above outrageous conduct and intentional violations of my Constitutional rights I suffered from severe emotional distress throughout my incarceration.

104) In many instances the US's very motive for violating my Constitutional rights was for the purpose of intentionally causing me emotional distress so that they could observe the outcome.

11

105) If the intentional violation of a man's Constitutional rights do not exceed the requirement for outrageous conduct then it is difficult to know what sort of actions would meet or exceed that requirement.

106) The repeated illegal seizures of my liberty interests by means of the abuse of the prison disciplinary process resulted in my being falsely imprisoned.

107) Bureau of Prisons employees are law enforcement officers of the US Government.[17]

108) False imprisonment is in itself sufficient cause for a claim of intentional infliction of emotional distress.

109) The US violated its duty of care to me.[18]

110) The US was negligent in allowing the almost daily violations of my Constitutional rights and violations of BOP & DOJ regulations to continue.[19]

111) The US is guilty of negligent supervision of its employees.

112) The US acted with reckless disregard of my health while allowing, instigating, and/or encouraging the above listed illegal and/or unconstitutional conduct.

113) This action is not subject to the Prison Litigation Reform Act since I was not incarcerated at the time that I filed this suit.[20]

114) Since my release from Federal prison in June 2008 and continuing through the present the US Government has conspired with individuals, corporations, and local governments to commit torts against me.

---

[17] 28 USC §2680 - the provisions of this chapter and section 1346 (b) of this title *shall apply* to any claim arising ... out of ... false imprisonment [or] abuse of process. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

18 USC §3050 - An officer or employee of the Bureau of Prisons may ... make arrests on or off of Bureau of Prisons property.

[18] Hoagland v. Gomez (676 A2d 187, 290 NJ Super 550) - If ordinance has been enacted which imposes duty on one class of persons for benefit or protection of another class of persons, breach of duty established by ordinance is evidence of negligence in suit by person within protected class who has been injured by breach of that duty.

[19] Csaranko v. Robilt (226 A2d 43, 93 NJ Super 428) - Where a penal statute, though conferring no private right of action upon injured party, establishes standard of conduct, its violation may constitute evidence of negligence in a civil action.

[20] Greig v. Goord [169 F3d 165] - We hold that litigants--like Greig--who file prison condition actions after release from confinement are no longer "prisoners" for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision.

115) The US has administered drugs to me without my consent. To this end they have covertly introduced pharmaceutical gasses into the air when I was indoors and shot me with a poison dart gun when I was outdoors.

116) The above allegation does not defy reality as we know it and clearly does not fall into the category of time travel or a trip to Pluto.[21] For example:

    a) Russian Spetsnaz forces used pharmaceutical gasses to end the siege of a Moscow theater by Chechen terrorists in 2002. The Russian government refused to reveal the classified composition of the gas. Obviously the US has even more sophisticated capabilities.

    b) In 1978, a ricin filled pellet, probably fired from an apparatus concealed by an umbrella, was used to murder Bulgarian dissident Georgi Markov in London. The apparatus was provided to the Bulgarians by the Soviets. It is reasonable to assume that the Soviets would not have let the Bulgarians have their newest equipment so clearly this classified technology is now over 50 years old. I believe that the US has modern equivalents that are smaller and can be made to look like pens or Blackberries. The Blackberry camouflage could be especially convenient since the screen combined with a concealed camera mounted in parallel with the barrel could be used as a covert sighting system. Obviously a man sighting an object by holding it up to his eye would be quite suspicious, but there is nothing suspicious about a man concentrating on a Blackberry screen.

117) In order install their gas distribution apparatus in my apartment at 3333 Broadway the US enlisted the help of codefendants Riverside Park (property owner) and Urban American (property manager). These defendants allowed the US to place its agents in their office acting as their employees. They also gave the US free access to my apartment, C23J, in the days before I moved in; after I moved in the US illegally burgled my home anyway. During the days before I moved in the US moved most, if not all, of the existing tenants on floor C23 out and moved their own people in. The US conducted renovations to my apartment for the purpose of installing their gas distribution system as well as a fiber-optic video surveillance system. At no time did the US have a court order to conduct said activities.

118) On October 23, 2008 I sent Urban American a registered letter (RA931678216US) to document and complain about the issues from paragraph 4. Urban American chose not to reply to my letter. I am attaching a copy of that letter as an exhibit. In the letter I refer to a purported Urban American employee named Natalie Mills. Natalie Mills is in fact an agent of the US.

119) Riverside Park and Urban American purposely overbilled me for rent. They ultimately fixed their mistake outside New York City Housing Court. While I was made whole with regard to the rent money I did suffer emotional distress as a result of the dispute. I sent Riverside Park a registered letter (RR908039903US) on November 21, 2009 detailing the

---

[21] Ashcroft v. Iqbal, 129 S. Ct. 1937, 1959 (2009) (Souter, J., dissenting)

problem, but they did not answer the letter and took me to court regardless. This dispute was orchestrated by the US for the purpose of causing me emotional distress.

120) While I was living in Riverside Park's building, one of the 'neighbors' that US had installed in conspiracy with Riverside Park and Urban American, would regularly play extremely loud music at all hours of the day and night with the intent and result of causing me emotional distress and depriving me of the quiet use of my apartment.

121) The US, with the help of codefendant Kings Realty, has also installed gas distribution apparatus and a fiber optic video surveillance system in my next apartment at 956 Hancock St, Brooklyn, NY prior to my arrival there.

122) The poison dart gun with which I was repeatedly shot left no trace and made no sound. The device operates pneumatically and the dart itself is composed of compressed drugs without a separate casing, thus not leaving any traces behind under the skin such as empty ricin pellets. In any event I have never found a dart. The dart gun operates through heavy clothing and, when it is calibrated properly, is painless, in other words it is generally not possible for a person to know that he has been shot.

123) On numerous occasions I was shot with darts while the gun was purposely set to an excessively high mussel velocity. The result was that I felt a sting as if I had been stuck with a small needle. This was done to cause me emotional distress in addition to that which was caused by the drugs which constituted the dart.

124) Regardless of whether the dart is painless or not I generally do know when I have been shot or gassed however by the effects, which generally make me sick.

125) Obviously whether via gas or dart each instance is an assault no different from that which would occur when a rapist adulterates a woman's drink with rohipnol (roofies), GHB (liquid x), Ketamine, etc.

126) Regardless of whether the method of drugging is painless, the results of the druggings are generally not painless. The drugs generally cause at least one of the following conditions: dysphoria (depression), akathisia, explosive diarrhea & intestinal cramps, insomnia, sleeping all day, rapid weight gain (80lbs in four months!), inability to eat, kidney stones, etc. Each drugging incident was either intentional medical malpractice or practicing medicine without a license.

127) In one instance the US drugged me so that I would be unable to attend a probation violation hearing in Federal Court. I called my 'lawyer' about three hours before the hearing to let him know that I was too sick to attend, but even so the judge issued a bench warrant for me.

14

I went to see my probation officer the following week and spent an afternoon sitting in a jail cell.

128) When I was released from jail and went back to the probation office to retrieve my property, including my house keys, my probation officer was absent and so were my money, ID, credit cards, and keys. The US Probation office intentionally deprived me of these items and in so doing caused me emotional distress. During my required visits to their office they would purposely harass me in other ways. For example, the security guards were told to make trouble for me at the metal detector. [22]

129) In the summer of 2010 my probation officer told me that I did not need to see him routinely during my monthly visits. He told me that I should instead use their new automated kiosk that would scan my fingerprint and allow me to fill out my monthly report via touchscreen. During the fall of 2010 the security guards harassed me so badly at the door that I had to leave without using the kiosk. I emailed my probation officer that I would not be back until he was there to supervise the security guards. I never heard back from him so I never went back to report although I did see him in court in November. In December of 2010 the court terminated my probation six months early, but never bothered to tell me, the judge gave me no indication that she was going to do so when I was in her court in November and even denied my request for international travel. I only found by accident out three months later. Obviously this whole problem with the security guards was staged so that I would think that I was on probation when I was not. I suffered emotional distress as a result of this harassment.

130) The US conspired with my doctor and codefendant, Jonathan Jacobs, so as to intentionally commit medical malpractice by denying me medical treatment for the conditions listed in paragraph 126.

131) In August 2010 Jonathan Jacobs refused to prescribe me Ambien or Lunesta when I told him that I could not sleep at night. He had prescribed me Ambien during my previous visit. When I begged and asked why he was doing this to me he replied "I cannot not interfere in something that I do not understand."

132) In August 2010 Jonathan Jacobs promised that he would treat my insomnia and other medical problems before my visit, but then once I went to see him he just wanted to talk for an hour and refused to treat my conditions as he had promised.

---

[22] I understand that US Probation mostly likely inherits the court's immunity from suits in performance of its judicial duties. Here I am suing for torts that were committed outside the scope of their judicial duties and thus I believe that they can be sued in this context, just as a judge can be sued in the context of his role as courthouse administrator.

133) Jonathan Jacobs was acting in conspiracy with the US for the purpose of evaluating my emotional health so that the US could fine tune their continuing efforts to cause me emotional distress.

134) The US stole my mail while it was in the possession of the US Post Office.

135) The US substituted lower dose counterfeit drugs for the drugs that I had ordered from pharmacies out of state and from England.

136) Subsequent to my filing a tort claim on June 23, 2010, the US substituted placebos for drugs that I had in my possession as well as drugs that were shipped via FedEx from an out of state pharmacy that I found on the Internet.

137) In June or July of 2009 I went to the emergency room at Columbia University Medical Center because I had not been able to eat in over a week. The reason that I had not been able to eat was a result of the US's drugging operation. While I was there several odd events occurred.
   a) A psychiatric resident insisted on sticking his finger in my ass.
   b) The lab claimed that one of my blood vials had gone bad necessitating that they take more blood. Their true reason was that the US wanted to run additional tests.
   c) The attending doctor in charge of the emergency room came around to ask questions about my treatment. This is not a normal occurrence.
   d) A new intern showed up who was there just for me.
   e) This same intern made a big show about how the patient next to me was going to get some morphine.
These incidents might seem harmless but taken together it was clear to me that the US was conspiring with the hospital. The result of this conspiracy was that I suffered emotional distress and that Columbia violated its duty of care to me.  Columbia also shared my medical records with the US.

138) In July and August of 2009 I went to the emergency room at New York Presbyterian Hospital twice for treatment of kidney stones; kidney stones that were a result of the US' drugging operation. What happened at NY Hospital on both occasions was a repeat of my experience at Columbia., including
   a) On my first visit the doctor gave me an oxycodone prescription. This was done as the request of the US so as to give me a US prescription that would help to keep me out of trouble with the oxycodone that I had received from England. On my second visit a different doctor said "We dont prescribe oxycodone for kidney stones."
   b) On my second visit a male nurse was rude and made abusive demands of me. When I refused to cooperate and told him that I was just going to lie there and wait for the doctor, he backed down and became contrite. The nurse was acting on behalf of the US.
The US conspired with the hospital and caused me emotional distress. NY Hospital violated its duty of care to me. NY Hospital also shared my medical records with the US.

16

139) In August of 2009 I went to see Joseph Del Pizzo, a urologist employed by NY Hospital to whom I was referred by the emergency room doctor. Again it was evident to me that he had been conspiring with the US based in part on the following events.

    a) There was a Federal agent in his personal office when I was there.

    b) He mailed me a prescription two months later with no explanation whatsoever.

    c) When I called about the prescription the woman who answered his phone made odd comments thus making it obvious that she was an agent of the US.

Again this conspiracy caused me emotional distress.

140) In October of 2009 the US, its agent Tara Tamang, and New York City jointly and severally had me falsely arrested for stalking and other misdemeanors.

    a) Tara Tamang is a Federal law enforcement officer.

    b) Tara was my sleep-over girl friend on and off for over a year.

    c) Tara swore out a false complaint against me.

    d) Tara made her complaint as part of her job duties for the US.

    e) The NY City Police arrested me in Federal Court during a probation violation hearing.

    f) The arresting officer knew that he did not have probably cause to make the arrest at the time that he did so. He refused to tell me what I was charged with when he arrested me. He instead gave me a vague answer that the charge was domestic violence related. He then told me not to worry and that I would be arraigned and released that same day.

    g) New York City purposely delayed my arraignment until 24 hours after I was arrested.

    h) The arresting officer made up a false quotation from me that was read at my arraignment.

    i) The charges were baseless and were eventually dismissed at the request of the prosecutor.

    j) I suffered emotional distress as a result of this incident.

141) The US, its agent Tara Tamang, and the New York City District Attorney jointly and severally maliciously prosecuted me and while doing so abused and manipulated the process.

    a) The prosecutor was in regular communication with the US Attorney's office.

    b) The prosecutor played a game with the intent of denying me my right to a speedy trial. Every time that we would show up in court he would claim that he was not ready for trial. Then a few days later he would file papers falsely claiming that he now was in fact ready for trial. Since the speedy trial clock only runs between the time when he was not ready for trial and when he was ready for trial he was able to manipulate the 60 day limit mandated by the New York State speedy trial law to instead last  over one year.

    c) The charges were baseless and were eventually dismissed at the request of the prosecutor.

    d) The prosecutor knew the charges to be baseless and without probably cause at the time he was prosecuting me.

    e) I suffered emotional distress as a result of these incidents.

142) In January of 2010 New York City in conspiracy with the US falsely arrested me.

    a) The charge was for vandalism to wires inside my apartment.

    b) I was arrested inside my apartment without an arrest warrant.

    c) The arresting officer banged on my door for a long time and promised me that he would break it down unless I let him in. Under duress I did let him in. He had no warrant.

d) The arresting officer knew the charge to be without probable cause at the time of the arrest.

e) The prosecutor refused to have me arraigned since the charges were baseless.

f) New York City purposely delayed my release until 24 hours after I was arrested.

g) At 5AM myself and the undercover cops who were with me in the holding cells were brought up from the relatively warm and spacious cells in the courthouse basement, where we had been sleeping, to sit in the cold and cramped cell outside the courtroom, where it is impossible to sleep. The reason that it was cold is because they do not turn on the heat until 8AM since no one is supposed to be there when court is not in session. Court starts at 9:30AM.

h) I suffered emotional distress as a result of this incident.

143) After my October 2009 arrest I was in jail for parts of four days. By law each part of a day counts as a whole day so officially I was in jail for four days. In fact I was there for two and half days, measured hourly. For the first two days of that time I was put in various holding cells and drugged continuously by undercover law enforcement officers so that I could not sleep at all for any of that time. I believe that they used the poison dart gun since I never caught anyone doing it. For the last few hours I was in a cell alone and was gassed. Whatever gas that it was caused me extreme pain. Defendant New York City violated its duty of care to me. I suffered emotional distress as a result of this experience.

144) When I banged on the cell door and pressed the intercom button the guard who was sitting nearby refused to come at all. The guard had been instructed to ignore me. One might assume that a guard would stop coming after a few times, but this guard did not come at all.

145) The gas delivery apparatus was operated and installed in the jail cell by the US with the cooperation of New York City. New York City was fully aware of what the US was doing.

146) The US conspired with Internet businesses IAC/InteractiveCorp (owner of Match.com), eHarmony.com, and Facebook.com so as to defraud me from receiving honest services from them. The US had conspired with these companies to alter their computer software so as to allow the US to covertly manipulate the confidential data exchanged between their subscribers. The result was that I was unable to communicate with any normal subscribers and was instead put into communication exclusively with agents of the US. I suffered emotional distress as a result of this fraud.

147) The US conspired with Apple and AT&T to develop the capability to covertly access and alter data stored on iPhones. The US in conspiracy with Apple and AT&T without a court order did access and change data stored on my iPhone.

148) When I bought my iPhone I expected that the data I had stored on my phone would stay on my phone and be safe from alteration. Apple and AT&T had a duty to disclose to their customers that they had intentionally inserted this capability into the iPhone firmware.

149) The US conspired with Directv for the purpose of sabotaging my Directv receiver. While I was living at 956 Hancock Street the receiver would reset itself generally every twelve hours which led to a fifteen minute blackout each time. I complained to Directv customer service and was told a pack of lies. Directv defrauded me and I suffered emotional distress as a result of this activity.

150) The US conspired with UPS, and FedEx so as to insert their agents as employees of UPS, and FedEx so as to cause me emotional distress. These defendants have also conspired so as to deny me honest service from said businesses. For example, packages have been stolen, tampered with, returned to sender, etc; deliverymen have been purposely rude, refused to bring packages to my door, etc.

151) The US and its agent, Tara Tamang with malice intentionally defamed me. Tara sent at least seventeen emails to Beatrice Guthrie, my mother, intentionally and falsely claiming that I was:
    a) mentally ill generally - "They (a manager and a worker) [of New York City Adult Protective Services] think that your son is mentally ill and a danger to himself." (APS did in fact visit my apartment and interview me. APS found that there was no evidence of mental illness.)
    b) suffering from memory loss - "Randy's memory is seriously fading to the point where it is noticeable. He is having difficulty recalling events that occurred within the last few months."
    c) suffering from depression - "he is severely depressed"
    d) suffering from schizophrenia - "sounds like a severe case of schizophrenia to me that is getting worse"
    e) using mind altering drugs - "he has started self medicating himself with something very strong or perhaps his condition is worse than it was a few weeks ago. I am afraid that he could incur permanent brain damage"
    f) suicidal - "He has mentioned that he feels like he wants to commit suicide"

152) Tara on instructions from the US contacted my mother both via telephone and email claiming that she was my friend and was very concerned about me and my mental health. Tara begged my mother to not reveal Tara's allegations to me lest I break up with her in which case Tara would no longer be able to furnish her with information about me. Many of these malicious lies occurred while my mother was outside of the US and did not have an easy way to personally check on me. When my mother and I were able to meet in person at the beginning of October 2009 my mother then realized that she had been duped. By intentionally damaging my relationship with my mother Tara intentionally caused me severe emotional distress.

153) Tara's defamatory emails both intentionally and negligently inflicted emotional distress on both me and my mother. Tara sent the emails with malicious intent. The content of Tara's emails is so outrageous and atrocious as to truly transcend all bounds of decency.

154) In April 2010 I decided to move out of New York City so as to escape the US' poison gas. I felt that I needed to live in a free-standing house so as not to have any shared walls through which gas or fiber optic apparatus could be installed or through which music could be played. At the time the US had fixed things with the judge supervising my probation so that I could not leave the Southern District of New York. The only place in the Southern District where I could afford to rent a house was Sullivan County. When I went to Sullivan County to look at houses the US was there waiting for me. The US conspired with Carol Malek, a local real estate broker, to block me from finding a house to rent. Carol Malek fraudulently introduced me to an agent of the US who was falsely claiming to be the owner of a house that I was interested in renting.

155) In January of 2011 I filed case SDNY 11 CV 0211 against a subset of the defendants in this case. In March of 2011 the court dismissed the case before any of the defendants had even answered the complaint.

156) The court seems to have purposely arranged for its decision to be overturned on appeal since the judge libeled me when he stated on the first page of his ruling that I pled guilty to defrauding the US. In fact, as the judge was well aware, I pled guilty to copyright infringement which it seems to me is a very different sort of a crime. As I stated in my appeal, someone who commits fraud is a professional liar and obviously if I lied in the past it could be inferred that I am lying now.

157) I appealed the dismissal, but my Form D-P disappeared from the appellate file. I have attached my copy of the Form D-P to end of this complaint. The clerk's receipt stamp can clearly be seen. There are in fact two stamps. This happened because I tried to file my Form D-P, brief, and other papers at the same time that I filed my notice of appeal. I was trying to save myself an extra trip to the courthouse. The Second Circuit and the SDNY both share the same courthouse. The clerk then returned my papers to me because they were missing the case number. The case number had yet to be assigned so I had not been able write it on the caption. I then properly refilled the papers with the case number two weeks later which is why there are two stamps.

158) About two weeks after I filed the second time someone noticed that the Form D-P was not in the file and wrote me a letter telling me to file one. The letter was sent to me in China. I have attached a copy of the letter and the envelope in which it was mailed to the end of this complaint. As is evident from the envelope, the letter was mailed with incorrect postage and then remailed. I received it after the deadline had already expired. At the time my copy of the Form D-P was in a shipping container on a ship so there was nothing that I could do. The US arranged for the letter not to reach me in time.

159) It is obvious that Form D-P's do not vanish on their own, that the US had unsupervised access to the case file, and that its disappearance was most convenient for the US. The US

removed the Form D-P from the file and still has the missing Form D-P in its possession. I would like the court to order the US to return the missing Form D-P.

160) On April 29, 2011, I mailed a registered letter (RR543832490US) from a Post Office in New York City to an address in New York City. The letter was properly and legibly addressed. Normally registered letters are delivered the next day to an address in the same city. This letter was not delivered until May 11, twelve days later. The letter contained a deposit refund check from my former landlord which would have been difficult for me to have replaced since I flew to China on the same day as I received and mailed the check. Under normal circumstances I would send a check via regular mail and save myself $10 and a trip to the Post Office. Given all of the claims listed above, I was fairly certain that the letter would be tampered with. This claim is hardly worth writing except that I happen to have documentation for it. I suffered minor emotional distress as a result of the US holding on to my letter for twelve days.

161) I arrived in Miami in August of 2011. I spent about two weeks looking for an apartment and moved into my present address on September 5th. Right after I moved in people started sliding furniture in the apartment above me making loud screeching noises. Even if I knocked on their door minutes after I heard the sliding no one ever answered. This noise was made by the US and it agents for the purpose of causing me emotional distress and depriving me of the quiet use of my apartment.

162) I decided that I should probably should break my lease and rent a house instead. Once I found a house and agreed to bring a deposit and sign a lease, the following day the real estate agent without explanation told me that he and the owner's agent would no longer deal with me. My credit is spotless. My FICA score is 760. I had been just accepted into my present building, which has really tough standards, two weeks previously. What had in fact happened in this case was that the US told the real estate agent not to rent me the house and that they would compensate him for the lost commission.

163) The noise coming from upstairs is pretty minor now and really not much to complain about. What is not minor however are the pharmaceutical gasses which is a repeat of my last two apartments. The gassing and dart incidents continue to the present with similar deleterious effects to me.

164) In order install their gas distribution apparatus in my apartment at 475 Brickell Ave – Apt 1114 the US enlisted the help of codefendants J & J Teq. III Corp (my landlord) as well as Iconbrickell Master Association, Inc, and Iconbrickell Condominium No. One Association, Inc. The Iconbrickell defendants allowed the US to place its agents in their office acting as their employees. They also gave the US free access to my apartment in the days before I moved in; after I moved in the US illegally has burgled my home anyway. The US conducted renovations to my apartment for the purpose of installing their gas distribution system as well as a fiber-optic video surveillance system. At no time did the US have a court order to conduct said

activities. These defendants have also set off the fire alarms on my floor for the primary purpose of harassing me and tampered with the TV and Internet service to my apartment.

165) In October 2011 I went to see a psychiatrist at the University of Miami to try to get some help with all of this emotional distress. My psychiatrist wrote me some benzodiazepine prescriptions, but when I went on different occasions to both Walgreens and CVS pharmacies I received fake drugs from the pharmacist. The pharmacists in both cases were undercover law enforcement officers. I know that the drugs were fake because after taking five or ten times the normal dose I was still wide awake, obviously I did not take the pills all at once. Sleep deprivation has been a regular feature of the conditions under which I have lived for the past few years. The US was acting in conspiracy with Walgreens and CVS.

166) In February 2012 the US manufactured charges against me in Florida State Court, Dade County case number F-12-004082. The so-called victim and witness in the case have been acting under orders from the Federal Government since before my so-called crime occurred. Subsequent to the so-called crime the Federal Government coerced the Miami Police and Dade County prosecutor into pursuing the case so that I am being prosecuted for aggravated battery with a deadly weapon for an alleged car accident that the so-called victim claims involves $500 in damages and no personal injury. You cant even fix a key scratch for $500. The police and prosecutor are well aware that the charges lack probable cause. This false arrest and malicious prosecution has been conducted for the purpose of causing me emotional distress and depriving of the use of my car which has been seized as 'evidence'.

167) The US with respect to the battery case is acting in conspiracy with the Dade County Public Defender's Office and my lawyers Jeff James and Jennifer Parrado thus violating attorney client privilege and denying me my right to competent legal representation.

168) Having me back in prison would be very convenient for the US since many of the claims listed in this suit would be disqualified under the Prison Litigation Reform Act were I to be incarcerated at the time that I filed.

169) In March 2012 the US poisoned to death my pet baby Macaw parrot. I suffered emotional distress as a result. I now am afraid to buy another pet since I do not want it to suffer a similar fate.

170) The US, local government, and corporate defendants are guilty of negligent supervision of their employees.

171) The defendants acted with reckless disregard of the my health while allowing, instigating, and/or encouraging the above listed illegal conduct.

172) The US and its coconspirators engaged in racketeering; to wit they
§659 switched placebos for drugs that I had ordered from a pharmacy out of state;
§659 stole a package of drugs from the mail that was shipped to me from England;
§1341 committed mail fraud when mailing Baker Donelson legal bills.
§1343 committed wire fraud while conspiring with Match, eHarmony, & Facebook;
§1952 unlawfully drugged me with controlled substances;
§1952 stole controlled substances from me;
§2320 used counterfeit marks on the counterfeit drugs with which they supplied me;
§2320 used counterfeit marks on the placebos with which they supplied me.

173) I claim the following damages, jointly and severally, against each defendant (based on, but not limited to, the torts of fraud, false imprisonment, assault, abuse of process, malicious prosecution, negligence, medical malpractice, intentional infliction of emotional distress, and civil conspiracy, as well as the federal racketeering statute):
• Compensatory damages in excess of $100,000,000.
• Punitive damages in excess of $200,000,000.
• Racketeering damages in excess of $200,000,000.
• Such other and further relief as this Court may deem appropriate, including costs and reasonable attorney's fees.

174) I would also like the court to order the US to immediately stop doing all of the illegal acts that I have listed in this complaint. I dont honestly expect that they will comply but I suppose that non-compliance with such an order would increase the amount of damages that will eventually be awarded to me.

**Conclusion:**

I am the first person to admit that this complaint is probably the strangest non-fictional story that I have ever read, but nevertheless it cannot be dismissed on this basis alone. If I had filed a complaint claiming that the US Government had put LSD in my coffee or that they had kidnapped and held me incommunicado on a farm in Virginia for five years, might those claims be dismissed? Maybe, but nevertheless those incidents did in fact happen. All one has to do is Google MK-ULTRA or Yuri Nosenko. I wonder if the victims of those crimes, perpetrated by the US Government, would have been able to have their claims heard impartially in Federal Court had they filed them prior to the revelations of the Church Committee.

Randolph Guthrie, Pro. Se.
475 Brickell Ave - #1114
Miami, FL 33131
randyguthrie@yahoo.com

Randolph H. Guthrie III
3333 Broadway  #C23J
New York, NY  10031

October 23, 2008

Urban American Management
596 - 56 St
West New York, NJ  07093

On October 17th I signed a lease for apartment C23J in the building that you manage at 3333 Broadway in New York City. On October 21st I discovered that the mortise lock which had been installed in my door by your company was worn out and damaged beyond repair. Among other problems the set screw which keeps the lock cylinder from being removed from the outside was loose which meant that anyone with a pair of pliers could have unscrewed the lock cylinder and entered my apartment between the 17th and the 21st. The reason that the set screw was loose was that the sleeve into which the set screw is supposed to be tightened had no threads left in it, thus allowing the set screw to move in and out unimpeded.

On the 21st I personally installed a Medeco 'top lock' and I no longer believe my apartment to be immediately vulnerable, however while the mortise lock has been jury rigged by your staff it has still not been fixed. Your building manager Tony Bolbolian has assured me that a new lock will be installed as soon as he receives one that will fit my door.

This incident is particularly disturbing to me in light of the fact that your employee Natalie Mills gave me my keys after I signed the lease and told me that "these are the only keys to your door and a new cylinder had just been installed this week." How then could your staff have installed a new cylinder without noticing that the set screw was loose? Either the installers were negligent, or more disturbingly I was being set up for a burglary. I hope that you will fully investigate this incident since these same workers may have installed similar defective locks in other tenants' doors. I had been under the impression that Natalie Mills was your building manager because Tony Bolbolian did not seem to be in the office during the week of October 13th when I was signing the lease and the application and Natalie handled both documents.

On October 14th I had to wait for two hours in the office at 3333 Broadway for Natalie's boss to vet my application. During that time I asked Natalie if I might go up and have another look at the apartment. Natalie refused and stated that I could only see the apartment with my real estate agent. Is this in fact your policy? This incident combined with the lock incident makes me think that maybe something was going on in that apartment that she did not want me to see. I would thus like to ask you for the record, were you doing any work in apartment C23J during the week of October 13th? Did any third parties have access to that apartment during the week of October 13th?

My actual lease runs from October 15, 2008 to September 30, 2009, however I paid for one year in advance. Obviously I am entitled to a refund of half a month's rent. In addition I was told that due to a special promotion that your company was running that I would also be receiving half a month's free rent. Natalie Mills told me to expect a refund check within one month. I don't expect any problems here but as long as I was writing this letter I thought that I should mention this issue.

The tenant in the apartment next to me C23H is in the habit of playing very loud music. I have not yet fully moved into my apartment yet so far I have already been disturbed by this music on October 19th and October 22nd. Both incidents occurred between 1 PM and 3 PM. The music was so loud that I could hear it clearly down the hall as soon as I stepped off the elevator. The noise that comes through our common wall is extremely disturbing to me. I made a written complaint to Tony Bolbolian on October 22nd about this problem. He said that he would try to solve it. Later that day I saw the occupant of C23H in the hallway and I asked her about the music. Her reaction was so say "What good is music if it is not loud!" With an attitude like that I have reason to doubt that Tony will be successful. If this problem continues you and the landlord can expect to be named as parties in a lawsuit quite soon.

When I signed my lease on October 17th Natalie took back both copies and said that I would be receiving my copy once it had been signed. So far I have not received my copy. I assume though that it is on its way.

Other very minor problems are that the rod that turns the mini-blinds in my apartment is broken and the microwave oven carrocell tray is missing. Tony has promised to address these issues also.

Sincerely,

Randolph Guthrie

### UNITED STATES COURT OF APPEALS
### for the
### SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 16ᵗʰ day of May, two thousand and eleven.

| | |
|---|---|
| Randolph H. Guthrie, III, | **ORDER** |
| | Docket Number: 11-1053 |
| Plaintiff - Appellant, | |
| | |
| v. | |
| | |
| United States Government, Federal Bureau of Investigation, City of New York, Riverside Park Community, LLC, Riverside Park Community II, LLC, Urban American Management, Kings Realty & Properties LLC, IAC / Interactive Corp., eHarmony.com, Facebook, Inc., Federal Express Corp., United Parcel Service,Inc., Directv, Apple, Inc., AT&T Inc., Columbia University Medical, New York Presbyterian Hospital, Jonathan Jacobs, Joseph Del Pizzo, Tara Tamang, Carol Malek, Malek Properfles, | |
| | |
| Defendants - Appellees. | |

A notice of appeal was filed on March 14, 2011. Appellant's Form D-P was due March 28, 2011. The case is deemed in default.

IT IS HEREBY ORDERED that the appeal will be dismissed effective June 6, 2011 if the form is not filed by that date.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**CIVIL APPEAL TRANSCRIPT INFORMATION (FORM D-P)**
**FOR PRO SE APPELLANTS**

A PRO SE APPELLANT MUST FILE THE ORIGINAL OF THIS FORM WITH THE CLERK OF THE SECOND CIRCUIT IN ALL CIVIL APPEALS WITHIN 14 CALENDAR DAYS AFTER FILING A NOTICE OF APPEAL.

| THIS SECTION MUST BE COMPLETED BY APPELLANT | | |
|---|---|---|
| **CASE TITLE**<br>Guthrie v. US, etc. | **DISTRICT**<br>SDNY | **DOCKET NUMBER**<br>11 - 1053 |
| | **JUDGE**<br>PKC | **APPELLANT** |
| | **COURT REPORTER**<br>None | **PRO SE APPELLANT**<br>Randolph Guthrie |

| | |
|---|---|
| Check the applicable provision:<br><br>☐ I am ordering a transcript.<br><br>☑ I am not ordering a transcript<br><br>   Reason for not ordering a transcript:<br><br>   ☐ Copy is already available<br><br>   ☑ No transcribed proceedings<br><br>   ☐ Other (Specify in the space<br>below): | **PROVIDE A DESCRIPTION, INCLUDING DATES, OF THE PROCEEDINGS FOR WHICH A TRANSCRIPT IS REQUIRED** (*i.e.*, oral argument, ruling from the bench, etc.)<br><br>None<br><br><br><br>**METHOD OF PAYMENT**   ☐ Funds      ☐ CJA Voucher (CJA 21) |
| **INSTRUCTIONS TO COURT REPORTER**<br><br>☐ **PREPARE TRANSCRIPT OF**<br>     **PRE-TRIAL PROCEEDINGS**<br><br>☐ **PREPARE TRANSCRIPT OF TRIAL**<br><br>☐ **PREPARE TRANSCRIPT OF**<br>     **OTHER POST-TRIAL PROCEEDINGS**<br><br>☑ **OTHER** (Specify in the space below):<br>*None* | **DELIVER TRANSCRIPT TO:  (APPELLANT'S NAME, ADDRESS, TELEPHONE)**<br><br>NA |

I certify that I have made satisfactory arrangements with the court reporter for payment of the cost of the transcript. *See* FRAP 10(b). I understand that unless I have already ordered the transcript, I shall order its preparation at the time required by FRAP and the Local Rules.

| APPELLANT'S SIGNATURE | DATE<br>March 3, 2011 |
|---|---|

COURT REPORTER ACKNOWLEDGMENT: This section is to be completed by the court reporter. Return one copy to the Clerk of the Second Circuit.

| DATE ORDER RECEIVED | ESTIMATED COMPLETION DATE | ESTIMATED NUMBER OF PAGES |
|---|---|---|
| **SIGNATURE OF COURT REPORTED** | | DATE |

27



CLERK'S OFFICE
U.S. COURT OF APPEALS
UNITED STATES COURTHOUSE
FOLEY SQUARE
NEW YORK, NY 10007

OFFICIAL BUSINESS

AIR MAIL

AIR MAIL

AIR MAIL

AIR MAIL

USM
SDNY

AIR MAIL